This time we'll hear LeGrand v. Walmart. Thank you. Thank you. Thank you, have a good day. Good morning, may it please the court. My name is Frederick K. Brewington, I am representing the appellants in this case. That being Ms. Chloe DeGrand and Ms. Angelina Mims. Your Honor, this matter arises at the pleading stage where a complaint was filed in the Eastern District of New York. And let me start off by saying that Ms. LeGrand was an employee, Ms. Mims was not an employee of the Walmart retail facility. And we want to be very clear that Ms. Mims in her 1981 claim and other claims was subjected to discrimination and retaliation and never claimed that she had an employee relationship with this defendant. What was the contractual relationship? The contractual relationship was that as a patron and that is listed in a number of paragraphs 12, 50, 51, 52, 53 and others. The district court took the position that she never alleged that she was a shopper. Was that, was there a basis for that? Well, Judge, she did. As a matter of fact, in paragraphs 37, 65, 77 of the complaint, she alleged that she was a patron of the store and indicated that in response to the fact that she, that there was allegations that she would be banned as a shopper and banned as a patron there, we did allege. Can you read the numbers again? Yes. They are 37, 65 and 77 and we made it also clear that it was not an employee relationship in other paragraphs. I can give you those numbers as well if you'd like those, Judge. Very well. Judge, so we wanted to be very clear with regard to starting that. The next thing I would like to address, please, if it pleases the court, is the constructive discharge claim. In this situation, the defendants failed to recognize that the conditions created were so intolerable that any reasonable person in plaintiff's shoes would be compelled to resign. Didn't she resign to go to school? Well, Judge, it just wasn't resigning to go to school. She was placed in a situation where when she came in, her schooling was part of essentially the deal coming into the job. They knew very well that that was important to her and important to her mother. So they're required to change her work schedule so she can go to classes? Well, Judge, in this situation, I would say yes because they did it for everybody else. In this situation, as is pled in the complaint, that she was treated differently than other non-disabled and non . . . You say that's an adverse employment action, right? She went to them shortly before she was going to start classes again and said, here's my school schedule. Can you change my hours? And they said no, and then she left, and you claim that's a constructive discharge, but is that an adverse employment action? Judge, we believe that it is as well, and we believe that not only did she come a month beforehand, but the response was not that we're not going to change the schedule. The response was quit school or quit your job. That's quite a very different situation, particularly in a set of circumstances where this employee was one that had certain disabilities and was clearly a person that indicated that she wanted to continue to work there. If I understand your argument, you don't rely exclusively on not changing the work hours to permit her to go to school. That's one of the items along with racially abusive epithets spoken by her superiors to other employees about her, which the district judge compared saying that it was on the same level as having, not superiors, but other employees saying things like holy holy or goody goody in another case. Judge, the statements made about these two women were outrageous and were not on the  Being called . . . You're saying that all this combination of factors is not just the refusal to change hours, but all those things together add up to the constructive . . . That is correct, Judge. Obviously, I did not get to those others yet, but the totality of the circumstances in this situation was so, and we believe well played, well set out and set before this court such so that looking at it and looking at the totality of the circumstances with regard to being referred to using the N-word and being called a porch monkey to a reliable source that reported it and made it known . . . But these things were not said to her. They referred to her. They referred to her, yes, Judge. But they were not spoken to her. And Judge, because they were not spoken to her does not . . . What's the consequence of that? I think the consequence is a little consequence. As a matter of fact, it may even have a greater impact. In this situation, once Ms. Legrand and Ms. Mims learned that these two supervisors were speaking about them using these untoward terms, that it would be even more devastating while you're looking at someone in their face and then they go behind your back and refer to you using the N-word. Outright devastation. And in this situation, we found it very interesting that one of the . . . Ms. Ailes, I believe, indicated that she had been so raised to refer to black people as porch monkeys and admitted that to another coworker. That's at paragraph 62. Was it Gonzalez that related these to your client? Is that right? Laurie Gonzalez? That is correct, Judge. And I will tell you while it is referenced in the complaint that Ms. Gonzalez and other employees, other employees referred this as well. Ms. Gonzalez was the one that came forward at the State Division of Human Rights and her name was well known to us at that time. Mr. Burrington, you ceded some time to the amicus? I did, Judge. And I thank you for your time. I'm sorry I didn't get to too many others. Thank you. Good morning. Good morning. Thank you, Your Honors. I'd like to address your point or your question about whether any of these comments were made directly to her face because, in fact, they were. Wal-Mart criticizes the EOC and the plaintiffs for misrepresenting the facts, but for the disability-related slurs, there are at least five paragraphs in the complaint that allege that these comments were made directly to her face, taunts about, are you taking your medication? Why are you taking your medication? Also she alleges that when she would make a mistake at work, her supervisors would make comments to her demeaning her about her disability. And if you'd like the paragraphs, they're 20, 26, 30, 87, and 91. So those all concern disability-related slurs made to her face. Of course, there are numerous slurs I think that you understand that were made behind her back, and I think that the complaint fairly read. You can have the inference that the comments were relayed to her by her coworkers while she was working. Do we have law about whether there's a distinction between comments made directly to one's face and comments made behind one's back? You have several cases recognizing the impact of that. One would be Torres v. Pisano, where comments were made not in her presence. Another one would be the Rivera case, which was about harassment, and the plaintiff testified to comments made to his face, like spick, but also this court considered comments made behind his back, which included spick and nigger spick, and said that his testimony was corroborated by others who had heard those. And you cite to a case which is frequently cited for this point, which was Avon, the Avon Schwab. And so, there definitely can be an impact to somebody, and sometimes I think it can be worse for a hostile work environment to know ... You've heard that argument. I mean ... Yes. So, you definitely do have authority, and I think that we cited it, too, in our brief. What is loosely called secondhand harassment goes into the calculus of a hostile work environment. So, the fact that these racist slurs were not made directly to her face doesn't negate their impact. And of course ... Especially when they're made by supervisors to coworkers. Yes, absolutely. Indicating a deprecation by the supervisor of the employee standing. Yes. And your circuit, you have precedent recognizing, and I will just be candid, that the word nigger is deeply offensive. It could be said even one time, and create a hostile work environment. You said that in the Daniel case. Also, Rivera talks about the impact of this kind of slur on an employee. So, I think that there's plenty of evidence. Walmart even makes the assertion, which I think is quite astonishing, that there is not any evidence here of discriminatory animus or retaliatory animus, but there is evidence in this complaint of both, including that the supervisor said that they called corporate on me, and I'm not going to help that n-word, because she almost made me lose my job. Now, if I could jump to a point that you asked about, about the change in schedule. She had requested that the schedule be suited to her school needs, and at least under Burlington Northern, which has a broader standard for retaliation claim, for what's an adverse action. In Burlington Northern, the Supreme Court discussed how a change in schedule for a mother with school-age children could be a materially adverse action, and we certainly think that you could fit into your analysis of the retaliatory, retaliation claim on the school schedule. Are there other questions I can answer? Thank you. Thank you. We'll hear rebuttal afterward. At this time, we'll hear from Walmart. Good morning, Your Honors. May it please the Court. My name is Lisa Griffith. I represent the defendants in this matter. At the onset, we just want to note that defendants do not condone the language that was allegedly used by the defendants. However, this is not what the appeal is about. The appeal is about what was pleaded in the amended complaint, and as pleaded, the complaint does not state a claim for relief. The allegations that are new in the briefs that were filed by the plaintiff that Ms. LeGrand was given or called, directly called names to her face is not true. There were no stream of verbal harassment towards her. Ms. Mims does not allege that she actually was prevented from shopping at Walmart. Could you just go back to your first point? Yes. Paragraph 33 says that after hearing about defendant Alice's faults and abusive comments, and Alice is a supervisor, plaintiff LeGrand and Mims reported this to Walmart. So they heard secondhand these comments, right, that Alice had made that are detailed in the complaint. Well, Your Honor, that would refer back to paragraph 32, in which it is referenced that it was told to Ms. LeGrand that Ms. Mims was not her mother, and that upset Ms. LeGrand so much that she cried at the cash register. Are you saying she didn't hear about the racist stuff? That is not what is alleged in the complaint. In fact, the initial complaint did not allege what the plaintiff complained about. In an effort to allow the plaintiffs to correct that, the plaintiffs were allowed to file an amended complaint. The amended complaint still does not specify what the plaintiffs allegedly complained about. Paragraph 33 refers back to 32, and that specifically says that she was upset about being told she was adopted and Ms. Mims was not her mother. That is not protected activity, to complain about being told that she's adopted. So throughout the complaint, there's various conclusory allegations about complaints being made, about allegations of things that were told to them, but nothing is specific. In fact, one could glean from the complaint, the amended complaint, that Ms. Mims and Ms. LeGrand may not have even been told that the defendants made these comments about them until after she was terminated, because there's nothing in the complaint to suggest that she was told about them during her employment. Without that, the allegations are not that this was talk among co-worker employees. This was supervisors who were alleged to have been making the derogatory comments, using the N-words, deprecating them. The case doesn't depend on management, on Walmart's corporate offices being told this. This was supervisors. This was the people who Walmart had placed in charge. But the question is, how did that become a hostile work environment if it's not alleged that Ms. LeGrand or Ms. Mims heard these comments made during the course of their employment? She's communicating to all the co-workers, all the co-workers, that this is somebody who is looked on as lower class, as despicable, as nothing by her supervisors. It is supervisors encouraging co-workers to look with hostility and contempt on a co-worker. Well, respectfully, Your Honor, it's not alleged in the complaint when Ms. Gonzalez allegedly heard the defendants make these comments either. I think that's the problem with the allegations in this complaint. They're not specific enough to even create a hostile work environment. Ms. LeGrand, what she's complaining about, things are typical of a retail cashier job. You might be assigned to a register that didn't have a draw, so we're going to reassign you to a different register. Paragraph 23, on several occasions between February 2013 and August 2014, Defendant Aulis was witnessed by many employees, including Ms. Lori Gonzalez, referring to LeGrand and plaintiff Mims as porch monkeys. Again, that was never reported to, as far as the complaint is concerned, it was never reported to Ms. LeGrand or Ms. Mims during the course of Ms. LeGrand's employment. This is a 12B6, though, right? Yes, it is, Your Honor. And you also say in your brief that you seem to disagree that we have had decisions about comments like this made to third parties that the plaintiff found out about later, that doesn't work. But that's not true under Schwab and Whitby, right? It can happen, as Judge LaValle pointed out. It can be part of the mix. It can be. In those cases, it was also said to the plaintiffs directly. In addition, they wanted to include other comments made outside the . . . Not those comments. I'm sorry? Comments about Schwab, some of them were not made in his presence. Correct. They were made to other police officers, and he found out about them later. That's our law, right, that that can be considered. Right, and in that case, some comments were made to him, and some comments were made outside his presence, and the court found that they could have some probative value. Here, no comments were allegedly made to the plaintiffs, and Judge Fierstein still did not disregard the comments. She said, in the totality of the circumstances, where the plaintiffs complaining about things like taking out cardboard or stocking shelves and other typical job duties of a retail cashier, and then having been told secondhand by someone else that a supervisor made comments, that doesn't rise to a hostile work environment. When she was told that comments had been made, when she was told secondhand that comments had been made, she was still employed. I don't know that, Your Honor, because it's not alleged in the complaint. Isn't that an inference that should be drawn in favor of the plaintiff? No, Your Honor, because the plaintiff had an opportunity to make those allegations in the amended complaint and did not make them. We don't have law that says that a complaint, that ambiguities in a complaint should be inferred in favor of the plaintiff? That's not the law? Well, I don't see that. That's the ambiguity here. I mean, a plaintiff had the opportunity to specifically identify when she learned this. Can you interpret the lack of specificity about when she was told that this was said, that we should assume that she wasn't told that until after she left employment, rather than assuming that she was told when she was still employed? There's nothing in the complaint to suggest that it was made during her employment, and if you were to review the State Division complaint that was filed after her employment, it omits any reference to the use of the N-word. What was the stated ground for requiring repleting? Because there were no specific allegations in the complaint about what was allegedly said to her, what complaints she made. So it was wholly conclusory, like similar to the amended complaint. Similarly situated employees were not treated the same way. That doesn't satisfy the Ipaw Twomley standard. There's no specific allegations of how Ms. LeGrand was treated differently than other employees that were outside her protected classes. In fact, she was a retail cashier. All the things that she complained about fit into the job duties of a retail cashier, and there are no suggestions that anything happened to her because of her race or her disability. In fact, Ms. LeGrand would still be working there had she chosen not to go to school. That was her option. Didn't she complain to Walmart executive offices twice though while she was still working about these comments? She alleges she did and that they never responded to her, but again, that was an opportunity in the amended complaint to flush out what those complaints were, and she did not. But you just said that she . . . Alleged. . . . that she complained. Well, that's all you can do in a complaint is allege. She alleged that she complained, and she alleged that there was no response. Then you're saying that that's just an allegation, but that's all you ever get to do in a complaint. Well, she doesn't allege what she complained about. In fact, if you go back to paragraph 33, she says she complained about being told that her mother was not her mother because she was adopted, and she complains about being written up for excessive absenteeism. Those two things are not specific to allege that she was complaining about race discrimination or disability-based discrimination. And if she were to claim . . . . . . district judge's comparison of a situation where coworkers have said things like that the worker is a plaintiff is a goody-goody or a holy-holy, comparing that as equivalent to a supervisor calling a plaintiff nigger and porch monkey to other workers. Is that a fair . . . is that a correct analogy by the district court, that those are equivalent? And the present case is no more serious, no more likely to create a hostile work environment than the other example? I don't believe that the judge was suggesting that this case was . . . that she was going to disregard the alleged comments because she was relying on case law about holy-holy and goody-goody comments. She, in fact, attributed the plaintiff's allegation that these comments were made and said, yet in the totality of circumstances, this is not a hostile work environment because of how she alleged what happened to her in the complaint. She's claiming that things that, you know, such as . . . What's the point of mentioning the holy-holy case? It seems like it was in a string set of other cases regarding situations where plaintiff alleged vulgar or abusive language. If you have no more questions, thank you, Your Honors. Thank you. We'll hear from . . . The defendant's view of what the law is in this case is not supported by their brief. They do not refer to Burlington North at all, even in their brief, which I think is telling. But with regard to the complaints being made and the inference to be drawn that, indeed, in this situation, the complaints that were made, not once, not twice, but three times, about the actions that were being taken, what they had learned, we would refer the courts to paragraphs not only 23 and 33 and 49, which really outline that, indeed, complaints were being made about the discrimination, the statements, the comments, but also in paragraph 26, it's a direct statement as to comments that were made directly to Ms. LeGrand's face, particularly with regard to her medication and her mental status. In the circumstances, Judge, we believe that throughout, there is more than sufficient information and reference in this complaint to show that not only was there a hostile work environment and discrimination, as well as retaliation, but that in this situation, as pled, that the two individuals that have been named here conspired with each other and stated so to Ms. Gonzalez and other individuals that they were planning on taking wrongful action, not only against Ms. Mims, but then forced a set of circumstances, as previously asked by Your Honor, that a situation would be set up for Ms. LeGrand to have no choice but to resign, not just the fact that they were having her doing a milk cart shelving or taking garbage out, but knowing that her disability and changing the job on her. Assuming that she quit in order to go to school, what's the allegation that this was forced by Walmart, other than the fact that they would not give her Fridays and Saturdays off? Judge, I think it's important to realize that that is one component of the entire set of circumstances that leads to the constructive termination. If she left for that reason, and perhaps this is a matter that's really for summary judgment rather than dismissal, but if she left for that reason, to go to school, what's the evidence that the end of employment was attributable to discrimination? Well, Judge, I think that it is a cumulative impact, and I agree with Your Honor. There is no record here to work with with regard to what's been developed from a factual standpoint in discovery, but changing work assignments, learning about the racial epithets that were used, altering the jobs, giving workstations without the necessary information that's necessary to do the job, being told to work without pay, then being told either to quit the job or quit school, the combination of those and the cumulative effect that deals with the totality of circumstances creates an untenable set of circumstances for any employee, no less this employee that was learning disabled and also was known to them to be one that took very seriously that her future education was something that she would be seeking. Judge, I see that I'm out of time. Are there any other questions that I can answer for the panel? Thank you. Thank you so much. The court will reserve decision.